1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

J & J CELCOM, et al.,

                    Plaintiffs,

          v.

AT&T WIRELESS SERVICES, INC., et al.,

                    Defendants.

No. C03-2629P

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

          This matter comes before the Court on Defendants' Motion for Summary Judgment on all of

Plaintiffs' claims, (Dkt. No. 202), and Plaintiffs' Motion for Partial Summary Judgment on their

claims for breach of partnership agreement, breach of duty of good faith and fair dealing, and breach

of fiduciary duty, (Dkt. No. 219).  Having reviewed the pleadings and supporting documents, and

having heard oral argument, the Court GRANTS Defendants' motion and DENIES Plaintiffs' motion.

Summary judgment is warranted on Plaintiffs' breach of partnership agreement and breach of fiduciary

duty claims regarding the switch-sharing service fees because Plaintiffs have failed to present any

evidence showing that they suffered damages as a result of Defendants' alleged breaches.  Summary

judgment is warranted on Plaintiffs' breach of partnership agreement claim regarding the sale of

ORDER - 1

1   partnership assets because Plaintiffs have not shown that these were illegitimate sales in violation of

2   the partnership agreement provision on asset sales.  Likewise, Plaintiffs have not shown that the sales

3   were acts outside the ordinary course of business requiring the consent of all the partners.  Summary

4   judgment is warranted on Plaintiffs' breach of the duty of good faith and fair dealing claim.  Plaintiffs

5   have not presented any evidence indicating that the partners in these partnership agreements intended

6   to limit to whom the partnership assets could be sold.  Summary judgment is warranted on Plaintiffs'

7   breach of fiduciary duty claim because Plaintiffs have not shown that there are genuine issues of

8   material fact about the adequacies of Defendants' disclosures prior to the Asset Sales or the

9   adequacies of the appraised value of the partnerships.  Summary judgment is warranted on Plaintiffs'

10  tortious interference claim because Plaintiffs' breach of partnership agreement claims fail.  Summary

11  judgment is warranted on Plaintiffs' negligent and/or intentional misrepresentation claim because

12  Plaintiff S&D Partnership has not presented any evidence that Defendants intentionally or negligently

13  misrepresented facts.  Summary judgment is warranted on Plaintiffs' unjust enrichment claim because

14  this cause of action does not apply to written contracts.

15                                          BACKGROUND

16          This case concerns eight partnerships that provided wireless telephone service to eight regional

17  areas in the United States.  The partnerships are named as follows: 1) "Boise City Cellular

18  Partnership" in Boise, Idaho, 2) "Fort Collins--Loveland Cellular Telephone Company" in Fort

19  Collins, Colorado, 3) "Greeley Cellular Telephone Company" in Greeley, Colorado, 4) "Redding

20  Cellular Partnership" in Redding California, 5) "Yuba City Cellular Telephone Company" in Yuba

21  City, California, 6) "Yakima Cellular Telephone Company" in Yakima, Washington, 7) "Texarkana

22  Cellular Partnership" in Texarkana, Arkansas/Texas, and 8) "Wheeling Cellular Telephone Company"

23

24

25

ORDER - 2

in Wheeling, West Virginia/Ohio (hereinafter the names of the partnerships are referred to simply by the city name).[1]

Plaintiffs, which include both individuals and partnerships, held small interests (collectively between 1% and 4%) in each of the eight regional partnerships identified above.  The remaining interests in the partnerships were held by wholly-owned subsidiaries of Defendant AT&T Wireless Services, Inc.[2] ("AWS"): AT&T Wireless Service of Idaho, Inc. ("AWS-ID") held a majority interest in the Boise partnership; AT&T Wireless Service of Colorado, Inc. ("AWS-CO") held the majority interest in the Fort Collins and Greeley partnerships; AT&T Wireless Service of California, Inc. ("AWS-CA") held the majority interest in the Redding and Yuba City partnerships; AT&T Wireless Service of Washington, Inc. ("AWS-WA") held the majority interest in the Yakima partnership; McCaw Communications of Texarkana, Inc. ("McCaw-TX") held the majority interest in the Texarkana partnership; and McCaw Communications of Wheeling, Inc. ("McCaw-Wheeling") held the majority interest in the Wheeling partnership.  Each partnership was governed by a partnership agreement ("PA").  (Pladson Decl., Exs. A-D, F-I (hereinafter, e.g. "Boise PA")).  All of these entities as well as AWS and McCaw Cellular Interests, Inc. ("McCaw")[3] are Defendants in this action.

Plaintiffs' allegations arise from two distinct but related set of facts.  The first set has to do with switch-sharing service[4] fees that AWS charged the partnerships.  The second set has to do with Defendants' conduct in selling the partnership assets.

---

[1]  The briefs refer to nine partnerships.  The ninth, for Rochester, Minnesota, is no longer at issue because the claims against the Minnesota partnership defendants were voluntarily dismissed after briefing on these motions was complete.

[2]  After this action began, AWS was acquired by Cingular Wireless in October, 2004.

[3]  McCaw Communications was acquired by AT&T Corporation, which later spun off its wireless business, AWS, as an independent and publically-traded company.

[4]  Switch-sharing services refers to the equipment, software, and networking facilities to route telephone calls and data transfers in a wireless network.

1    I.  Fees for Switch-sharing Services

2         In 1996 and 1997, partners holding minority interests in various partnerships (which included

3    the Plaintiffs in this action) filed a class action lawsuit in the Northern District of California against

4    AWS and its subsidiaries alleging, among many other claims, that the switch-sharing service fees that

5    AWS charged the partnerships were not reasonable.  This case is referred to as the *Linney* class action.

6    The *Linney* class action settled.  Under the terms of the Settlement Agreement, AWS "agreed to

7    substantially lower its switch-sharing fee to not more than $.015 per minute of use."  (Settlement

8    Agreement, § 2.1(f).  This provision of the settlement was to be in effect from January 1, 1996 until

9    January 1, 2004.  (Id., § 2.2(f)).  (Hague Decl., Ex. E (hereinafter "Settlement Agreement")).

10        In their Complaint in this action, Plaintiffs allege that Defendants violated the partnership

11   agreements and breached their fiduciary duties 1) by continuing to charge $.015 per minute of use

12   ("MOU") since the effective date of the Settlement Agreement even though the actual costs of

13   providing switch-sharing service have decreased substantially and 2) by failing to disclose at the end of

14   2003 the effect of the sunset of the Settlement Agreement.

15   II.  Sale of Partnership Assets and Dissolution of the Partnerships

16        The cellular service provided by these partnerships was sold under the AWS brand and was

17   connected to AWS's national wireless network.  AWS handled the billings, collections, customer

18   support, and other services for operating the partnerships.  AWS prepared the tax returns for the

19   partnerships and generally handled all administrative matters for the partnerships.  Plaintiffs did not

20   participate in the day-to-day operations of the partnerships.  They received periodic cash distributions.

21   AWS and the respective AWS subsidiaries held annual partnership meetings.  AWS prepared and

22   provided annual financial statements for the minority partners, which it hired PricewaterhouseCoopers

23   LLP to audit.  According to AWS, it prepared these annual financial statements solely because there

24   were minority partners that held interests in the partnerships.  AWS asserts that it does not normally

25   prepare such statements or hold such meetings for regional markets that it wholly owns.  Plaintiffs do

ORDER - 4

not dispute this.  AWS maintains that the costs of preparing these financial statements was significant and that Plaintiffs, whose collective ownership was between 1% and 4% for each partnership, bore only a fraction of the total costs that were incurred solely for their benefit.

To address this situation, AWS sought to buy out the minority partners' interests beginning in 2001.  Many minority partners of other partnerships voluntarily agreed to sell.  Plaintiffs did not.  Two AWS managers, Todd Pladson and Mark Bradner, assessed the situation and recommended that AWS offer Plaintiffs a last opportunity to sell and if they declined, the AWS subsidiaries would vote their majority interests to sell the partnership assets to a newly formed partnership wholly owned by AWS, thereby dissolving the partnerships.[5]  Plaintiffs would be paid their pro rata share of the purchase price. AWS authorized Pladson and Bradner to carry out this plan.

To establish the purchase price, AWS hired valuation professionals at Arthur Anderson to appraise the value of the partnerships.  The Arthur Anderson team prepared appraisals for the Boise, Fort Collins, Greeley, and Yakima partnerships as of September 30, 2001.  (Pladson Decl., Exs. L-M, S).  After Arthur Anderson disbanded, the same team transferred to Kroll, Inc.  They prepared appraisals for the Redding, Yuba City, Texarkana, and Wheeling partnerships as of June 30, 2002. (Id, Exs. O, Q-R, T).  Pladson and Bradner both believed, based on their experience in this industry, that the values determined by the Arthur Anderson/Kroll team were reasonable.

AWS offered to buy out Plaintiffs' interests for a price slightly higher than their portion of the respective valuations.  This offer was sent to Plaintiffs, accompanied by a letter from Arthur Anderson/Kroll summarizing the valuation report, as well as financial information for the applicable partnership.  AWS indicated in the offer that its subsidiaries intended to use their majority interests to

---

[5]  Plaintiffs request that the Court strike the Pladson declaration on the grounds that he improperly offers expert opinion.  Pladson does not purport to offer expert opinion.  Rather, he addresses topics and facts of which he had personal knowledge based on his job position at AWS. Therefore, Plaintiffs' request to strike Pladson's declaration is denied.

1   vote to sell the partnership assets and thereby dissolve the partnership and distribute to the minority

2   partners their pro rata share of the purchase price.  Plaintiffs refused to sell.

3        Before selling the partnership's assets (hereinafter referred to as "the Asset Sale"), the AWS

4   subsidiaries that held the majority interest in each partnership formed a new partnership to buy the

5   assets of the old partnership.  For example, the majority partners in the Boise partnership were AWS-

6   ID and McCaw, both of which are corporations wholly owned by AWS.  (AWS-ID and McCaw

7   collectively owned 99.06% of the Boise partnership; Plaintiff J&J Celcom owned less than 1% of this

8   partnership.)  AWS-ID and McCaw together formed the "New Boise City Cellular Partnership."  The

9   New Boise City Cellular Partnership offered to buy the assets of the Boise partnership.  The Boise

10   partnership held a special meeting to discuss the offer.  A vote was taken and passed approving of the

11   sale based on the Arthur Anderson/Kroll appraised value.    The New Boise City Cellular Partnership

12   purchased the assets of the Boise partnership on July 8, 2002.  AWS sent a check to the minority

13   partner for the partner's pro rata share of the purchase price.

14        Plaintiffs filed this action against AWS and the AWS subsidiaries that owned the eight

15   partnerships at issue.  Plaintiffs allege seven causes of action in their Third Amended Complaint.  (Dkt.

16   No. 176).  Count 1: Breach of duty of good faith and fair dealing and breach of fiduciary duty (this is

17   really two separate causes of action).  Count 2: Breach of partnership agreements.  Count 3: Tortious

18   interference.  Count 4: Intentional and/or negligent misrepresentation, brought only by Plaintiffs S&D

19   Partnership and Ronald Wilson.  Count 5: Unjust enrichment.  Count 6: Rescission of sales of assets.

20   Count 7: Constructive trust.

21                                                ANALYSIS

22        Summary judgment is not warranted if a material issue of fact exists for trial.  Warren v. City

23   of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying

24   facts are viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus.

25   Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the

1    evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v.

2    Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment has the

3    burden to show initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H.

4    Kress & Co., 398 U.S. 144, 159 (1970).  However, once the moving party has met its initial burden,

5    the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an

6    element essential to that party's case, and on which that party will bear the burden of proof at trial.

7    Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  To discharge this burden, the nonmoving

8    party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue

9    for trial.  Id. at 324.  Additionally, "at the summary judgment stage the judge's function is not . . .  to

10    weigh the evidence . . .  but to determine whether there is a genuine issue for trial."  Liberty Lobby,

11    477 U.S. at 249.

12    I.  Choice of Law

13         Each of the eight partnership agreements contain a choice of law clause.  Four of the

14    partnership agreements (Boise, Fort Collins, Greeley, and Texarkana) are governed by the laws of the

15    District of Columbia.  Three (Yuba City, Yakima, and Wheeling) are governed by the laws of

16    Delaware.  One (Redding) is governed by the laws of Maryland.  Both parties agree that the choice of

17    law provisions apply to the breach of contract and breach of the duty of good faith and fair dealing

18    claims.

19         The parties dispute which state's laws applies to the breach of fiduciary duty and other tort

20    claims.  A claim for breach of a fiduciary duty is a tort claim.  Miller v. U.S. Bank of Washington, 72

21    Wn. App. 416, 426, 865 P.2d 536 (1994).  Defendants contend that Washington law applies; Plaintiffs

22    contend (somewhat equivocally) that District of Columbia, Delaware, and Maryland law applies.  A

23    federal court sitting in diversity (as this Court does in this case) must apply the choice of law rules of

24    the state where court sits to determine which state's law applies.  389 Orange St. Partners v. Arnold,

25    179 F.3d 656, 661 (9th Cir.1999).  Under Washington law, "[a]n actual conflict between the law of

ORDER - 7

1 Washington and the law of another state must be shown to exist before Washington courts will engage

2 in a conflict of law analysis. . . . Absent such a showing, the forum may apply its own law." Burnside

3 v. Simpson Paper Co., 123 Wn.2d 93, 103-104, 864 P.2d 937 (1994).  Plaintiffs conceded at oral

4 argument that they did not know whether there was any conflict of law here, but suggested that there

5 likely was not.  All four states have adopted the Revised Uniform Partnership Act.  Consequently, this

6 Court will apply Washington law to the breach of fiduciary duty and other tort claims.

7 II.  Claims Relating to Switch-sharing Service Fees

8      Defendants seek summary judgment on Plaintiffs' claim that Defendants breached the

9 partnership agreements and their fiduciary duties by charging excessive switch-sharing service fees.

10 Plaintiffs' switch-sharing claim fails because Plaintiffs have not presented any evidence that they have

11 suffered actual damages.  It is axiomatic that success on a breach of contract or breach of fiduciary

12 duty claim requires that a plaintiff show damages resulting from the alleged breach of contract or

13 fiduciary duty.  Because Plaintiffs have not shown any damages, summary judgment on these claims is

14 warranted.  Consequently, the Court need not reach Defendants' argument that the *Linney* settlement

15 bars Plaintiffs' switch-sharing claim or that the statute of limitations bars a portion of this claim.

16      The "Arrangements with Partners" clause in the partnership agreements provides that the

17 partnership may enter into agreements with an affiliate of a Partner for the performance of services

18 related to the partnership business, so long as the agreement is "on terms no less favorable to the

19 [partnership] than could be readily obtained if it were made with a person who is not a Partner or

20 affiliate of a Partner."  (Boise and Texarkana PAs, § 6.5; Fort Collins and Greeley PAs, § 4.7;

21 Redding, Wheeling, Yakima, and Yuba City PAs, § 4.8).  This clause required that any switch-sharing

22 services provided by affiliate AWS were to be provided for rates or fees that could be obtained from

23 an outside third party.  Plaintiffs argue that the switch-sharing fees were excessive because they were

24 much higher than the costs that AWS actually incurred in providing these services or because AWS

25 failed to keep track of the actual costs for providing such services.  These arguments are red herrings.

1    Nothing in the Arrangements with Partners clause required that AWS provide switch-sharing services

2    at cost or that the fees charged necessarily have any correlation with the costs of providing such

3    services.

4         Defendants point to Plaintiffs' lack of evidence that the partnerships would have obtained

5    switch-sharing services from a third party on terms more favorable than $.015 per MOU.  (Defs' Mot.

6    at 34-35).  Summary judgment is appropriate when the moving party (e.g. Defendants) shows that the

7    non-moving party (e.g. Plaintiffs) does not have enough evidence of an essential element to carry its

8    ultimate burden at trial.  Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103

9    (9th Cir. 2000).  The only evidence that Plaintiffs present regarding switch-sharing services provided

10   by outside third parties is the alleged costs incurred by U.S. Cellular Corporation and Western

11   Wireless Corporation for providing such services.  Plaintiffs assert that U.S. Cellular's costs for

12   providing switch-sharing services (for an unspecified time period) were $.0025 per MOU.  They assert

13   that Western Wireless' total costs per minutes of use (e.g. switch-sharing services plus many other

14   services) declined from $.09 per MOU in 1998 to $.022 per MOU in 2003.  (Mangan Decl., Ex. M at

15   No. 5).

16        There are multiple problems with this evidence.  First, both of these assertions are based on

17   hearsay.  The allegations regarding U.S. Cellular are based on oral statements made in partnership

18   meetings.  The allegations regarding Western Wireless are based on a website; Plaintiffs have not

19   established why or how such allegations based on a website that Plaintiffs did not create and do not

20   own are admissible.  Second, Plaintiffs cite only the total cost for Western Wireless, of which switch-

21   sharing services are a component.  Plaintiffs present no evidence indicating what percentage of the

22   total the switch-sharing costs amount to; their claim that it is a small fraction is unsupported by any

23   evidence they have presented.   Third, there is no indication that these figures refer the fees these two

24   companies charged for providing switch-sharing services; they appear to refer to the companies'

25   respective costs incurred in providing switch-sharing services (as distinct from the fees charged).  As

ORDER - 9

1  discussed above, the Arrangements with Partners clause does not require that the fees charged for a

2  service have any specific correlation with the costs incurred in providing the service.  In their response,

3  Plaintiffs do not present any evidence to show that the partnerships could have obtained switch-

4  sharing services for lower rates than the $.015 per MOU rate provided by AWS.

5       Plaintiffs attack the switch-sharing fees from a different angle in their response.  They suggest

6  that the partnerships could have purchased their own switch and thereby increased the partnerships'

7  profitability, but that Defendants never investigated this option.  (Plfs' Resp. at 8).  Plaintiffs cite to

8  their expert Charles Walters' January 12 report to support their argument.  He states that the

9  profitability of the partnerships would have increased from 17.5% to 33.8% if the partnerships had

10  purchased their own switch.  (Walters Decl., January 12, 2004 Report at 13).  However, he does not

11  state the factual basis for this opinion.  "The factual basis for the expert's opinion must be stated in the

12  expert's affidavit."  Guidroz-Brault v. Missouri Pac. R.R. Co., 254 F.3d 825, 831-32 (9th Cir. 2001).

13  More importantly, there is nothing in the partnership agreements or the *Linney* settlement that

14  obligated the partnerships to investigate or expand the partnership operation by purchasing their own

15  switches.

16       Lastly, Plaintiffs' claim that Defendants failed to disclose at the end of 2003 the effect of the

17  sunset of the Settlement Agreement is not actionable.  Neither party argued this claim.  Nothing in the

18  Settlement Agreement or the partnership agreements required that Defendants make such a disclosure.

19

20  III.  Claims Relating to Asset Sales

21       A.  Breach of Contract Claim

22       Plaintiffs advance two distinct arguments to support their breach of partnership agreement

23  claim.  First, they argue that the Asset Sales were not legitimate sales because the seller and buyer

24  were nearly identical entities and because there was no consideration, and therefore Defendants

25  breached the partnership agreement provision governing a sale of partnership assets.  Second,

Plaintiffs argue that the Asset Sales were outside the partnerships' ordinary course of business and that six of the eight partnership agreements required the consent of all the partners prior to acting outside the ordinary course of business, which Defendants failed to obtain.  As discussed below, neither of these arguments is persuasive and summary judgment in favor of Defendants on this claim is warranted.

As a general matter, the District of Columbia, Delaware, and Maryland all follow the law of objective interpretation of contracts.  Where the contract language is clear and unambiguous, the court must give the contract its plain meaning.  Westfield Ins. Group v. J.P.'s Wharf, Ltd., 859 A.2d 74, 76 (Del. Sup. Ct. 2004) ("If the [contract] provision is ambiguous, it will be read in a way that satisfies the reasonable expectations of the average consumer.") (internal quotes and citation omitted); Bragdon v. Twenty-Five Twelve Assoc. Ltd. P'ship, 856 A.2d 1165, 1170 (D.C. Ct. App. 2004); Auction & Estate Representatives, Inc. v. Ashton, 731 A.2d 441, 444 (Md. Ct. App. 1999).  Language is ambiguous only if it is reasonably susceptible to different interpretations.

### 1.  The Validity of the Asset Sales

Six of the eight partnership agreements (Fort Collins, Greeley, Redding, Wheeling, Yakima, and Yuba City) provide for dissolution of the partnership upon the sale or assignment of substantially all of the assets of the partnership.  Section 9.1 of the respective partnership agreements states: "the Partnership shall dissolve upon the occurrence of . . . the sale or assignment of substantially all of the assets of the Partnership . . . ."  (Fort Collins, Greeley, Redding, Yuba City, Yakima, and Wheeling PAs).  The Boise and Texarkana partnership agreements both allow for a sale of all or substantially all of the partnership assets upon a 66.6% vote of the partners.  (§ 6.7 of the Boise and Texarkana PAs).

Plaintiffs argue that the Asset Sales were not valid "sales" because the buyer was nearly identical to the seller (both were AWS subsidiaries) and because there was no consideration.  Plaintiffs cite Black's Law Dictionary, which defines "sale" as "the transfer of property or title for a price. . . . The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being

ORDER - 11

1    transferred, and (4) a price in money paid or promised." (Black's Law Dictionary, 7th ed. 1999). As

2    further support, Plaintiffs point to the fact that each of the new partnerships continued the same

3    business as the previous one it replaced, that neither AWS nor its subsidiaries notified employees,

4    customers, or suppliers of the change, that there were no new bank accounts created for the new

5    partnerships, and that no taxes were paid on the sale.

6          As a threshold matter, Defendants dispute the significance of the fact that no notice of sale was

7    sent to employees, customers, or suppliers. According to Defendants, AWS had already been

8    managing the day-to-day operations of the partnerships and providing a centralized accounting system.

9    AWS directly serviced the partnership's respective customers. The partnerships did not have their

10    own bank accounts. (Thompson Decl. in support of Defs' Resp., ¶ 3). Plaintiffs do not dispute these

11    facts. Therefore, there is no reason why notice or new bank accounts would have been necessary.

12          Defendants are correct that nothing in any of the partnership agreements limited to whom the

13    partnership assets could be sold. If the parties intended to limit the sale to non-affiliated entities, they

14    could have done so in the agreements. The language regarding sales is unambiguous. Under an

15    objective interpretation of the language in the partnership agreements, the absence of language limiting

16    to whom partnership assets could be sold prevents the Court from reading such a limitation into

17    otherwise clear language.

18          Plaintiffs maintain that, even if the agreements did not explicitly prohibit them, a transaction

19    between a buyer and seller controlled by the same interest is not a legitimate sale. Plaintiffs cite to a

20    number of state law cases involving a right of first refusal in the real property context, where the issue

21    was whether a transfer between related entities constituted a sale that would trigger the right of first

22    refusal. See Texaco Antilles Ltd. v. Creque, 273 F. Supp. 2d 660, 663 (D.V.I. 2003); McGuire v.

23    Lowery, 2 P.3d 527 (Wyo. Sup. Ct. 2000); Belliveau v. O'Coin, 557 A.2d 75 (R.I. Sup. Ct. 1989)

24    (transfer from an individual to corporation controlled by the individual was not a sale triggering the

25    right).

ORDER - 12

1    These cases are of marginal relevance and are distinguishable on their facts.  In McGuire,

2    plaintiffs had a right of first refusal to purchase land owned by defendants.  Defendants transferred the

3    land to a corporation that defendants owned and controlled.  Plaintiffs argued that defendants had

4    violated the right of first refusal because the transfer was a "sale" triggering the right.  The court

5    rejected that claim, holding that the transfer was not a sale because the property remained under the

6    exact same control as before.  The court distinguished cases in which a transfer of property from a

7    partnership to a single partner was deemed a sale.  In those cases, the control of the property changed

8    by virtue of the transfer because management decisions under the partnership had to be made

9    unanimously.  2 P.3d at 532.  In the case at bar, there is an equal change of control because the

10   constellation of partners changed, which necessarily means a change in control regarding decisions

11   requiring unanimous consent under the terms of the partnership agreements.  Therefore, this case is

12   unlike McGuire because there was a change in control as a result of the Asset Sales.

13   In Texaco, the parent corporation decided to transfer real property from one subsidiary to a

14   different subsidiary.  No money was exchanged.  The court held that this transfer did not constitute a

15   sale triggering the right of first refusal because there was no bona fide offer, acceptance, or

16   consideration.  The court noted that even though the two subsidiaries were separate corporate entities

17   for tax and other corporate and business purposes, "they had no control over the terms of this

18   transaction and certainly did not deal with each other at 'arm's length.'  [They] shared the same

19   directors, officers, and ownership; they were not 'strangers to the transaction.'"  273 F. Supp. 2d at

20   663.  Unlike in Texaco, in the case at bar there was a formal offer by the newly formed partnership

21   (even if the partners in that newly formed partnership were AWS subsidiaries), there was formal

22   acceptance by the original partnership via a vote of the majority partners, and there was consideration

23   (discussed below).  Further, unlike in Texaco, there was an appraisal done by outside professional

24   accountants.  While these transactions were not between a buyer and seller who are "strangers"

25   to each other in the traditional sense, Defendants did not have complete control over the transaction

ORDER - 13

1   like the defendants in <u>Texaco</u> because Defendants here the based the purchase price on the

2   independent appraisal.  This counteracted any possible collusion that otherwise could have cast a

3   shadow over the transaction.

4          As to the question of consideration, Plaintiffs maintain that no money was actually exchanged

5   between the buyer and the seller and that none of the original partnerships received any money.

6   Plaintiffs' argument is belied by the fact that they received checks for their pro rata share of the

7   purchase price, which was based on the appraisals by Arthur Anderson/Kroll.  Furthermore, there was

8   an Asset Purchase and Sale Agreement for each partnership, which described the consideration paid.

9   (Nylander Decl., Exs. 1-9).  A Bill of Sale was entered for each of the nine partnerships.  (Mangan

10  Decl. in support of Defs' Resp., Ex. C).  Plaintiffs counter that the bill was signed by the same person

11  for both parties, but fail to cite any authority that makes such a bill of sale invalid.  The fact that no

12  check was exchanged between the AWS subsidiary seller and the AWS subsidiary buyer is of little

13  significance since AWS does not maintain separate bank accounts for the subsidiaries.

14              2.  Conduct Outside the Ordinary Course of Business

15         Plaintiffs argue that the Asset Sales were acts outside the ordinary course of business and that

16  Defendants breached six of the eight partnership agreements by failing to comply with the applicable

17  default rule in partnership law requiring unanimous consent of the partners for acts outside the

18  ordinary course of business.  According to Plaintiffs, the default rules apply because nothing in these

19  six partnership agreements specify the type of vote required for a sale of the partnership assets.[6]

20         Under the laws of Delaware, Maryland, and the District of Columbia, the default rules of

21  partnership law apply unless the parties have provided otherwise in the partnership agreements.  Under

22  the default rules, an act outside the ordinary course of business requires the unanimous consent of all

23  _____

24         [6]  Plaintiffs concede that this argument does not apply to the Boise and Texarkana partnerships
    because those agreements explicitly provide for a supermajority (66%) vote for any sale of partnership
25  assets.

1  partners.  DC ST §§ 33-101.03(a), 33-104.01(j); DE ST TI 6 §§15-103(a), 15-401(j); MD Code,

2  Corps & Ass'ns §§ 9A-103(a), 9A-401(j).

3         That particular default rule does not apply here because the six partnership agreements at issue

4  contain a provision that replaces this particular default rule.  Each of these partnership agreements

5  contains a clause titled "Partner Voting" that outlines when a simple majority vote, supermajority vote

6  (66%), or a unanimous vote is required.  This provision states that a supermajority vote is required to

7  amend or modify the partnership agreement or to admit to the partnership a new partner or a partner

8  "who acquires all or a portion of the Ownership Interest of a Partner."  A unanimous vote is required

9  for a proposal to convert the partnership to a corporation, LLC, or LP, or "otherwise reorganize or

10 alter the form of the entity through which the Partnership Business is conducted."  A simple majority

11 vote is required for every other act requiring a vote of the partners.  (Fort Collins, Greeley, Redding,

12 Wheeling, Yakima, and Yuba City PAs, § 4.1).  Defendants argue persuasively that this provision

13 replaces the default rule requiring unanimity for conduct outside the ordinary course of business

14 because this provision identifies the specific actions that require a unanimous vote.  Consequently,

15 anything not included in this list of conduct requiring unanimity falls under the simple majority

16 category.  "The expression in a contract of one or more things in a class implies the exclusion of all

17 other things."  Vinson v. Marton & Assoc., 764 P.2d 736, 743 (Ariz. Ct. App. 1988).  Plaintiffs do not

18 refute or counter Defendants' argument.

19        B.  Breach of Duty of Good Faith and Fair Dealing

20        The laws of the District of Columbia, Delaware, and Maryland all impose a duty of good faith

21 and fair dealing on partners in carrying out the duties or enjoying the rights of the partnership.  DC ST

22 § 33-104.04(d); DE ST TI 6 §13-103(b)(3); MD Code, Corps & Ass'ns § 9A-404(d).

23        Under Delaware law, the duty  of good faith and fair dealing bars a party from engaging in

24 "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract

25 from receiving the fruits of the contract."  Pami-Lemb Inc. v. EMB-NHC, LLC, 857 A.2d 998, 1016

1    (Del. Ch. Ct. 2004). "[I]n the narrow context governed by the principles of good faith and fair

2    dealing," a court may interpret a contract to reflect the reasonable expectations of the parties.

3    Cincinnati Smsa Ltd. P'ship v. Cincinnati Bell Cellular Sys., 708 A.2d 989, 992 (Del. Sup. Ct. 1998).

4    Thus, a party may breach the duty even if he has not breached the express terms of the contract.

5    Pami-Lemb, 857 A.2d at 1016. "The implied covenant is designed to protect the spirit of an

6    agreement when, without violating an express term of the agreement, one side uses oppressive or

7    underhanded tactics to deny the other side the fruits of the parties' bargain." Id. However, the court

8    should not imply additional obligations based on the duty of good faith and fair dealing that are

9    otherwise beyond the clear language of the contract. Cincinnati, 708 A.2d at 992-93.

10        In Cincinnati, a partnership agreement barred partners from competing in providing "cellular

11    services." Defendants engaged in providing similar services based on new technology developed after

12    the agreement went into affect that did not fall within the agreement's definition of "cellular services."

13    The court held that the defendants did not violate the duty of good faith and fair dealing because the

14    court was "not compelled to conclude that, had [the parties] thought to address the subject, the

15    partners more likely than not would have agreed to include [the new technology] . . . in the

16    Agreement's noncompete clause." Id. at 993.

17        The laws of the District of Columbia and Maryland are similar. See Paul v. Howard

18    University, 754 A.2d 297, 310 (D.C. Ct. App. 2000) (under the District of Columbia's duty of good

19    faith and fair dealing "neither party shall do anything which will have the effect of destroying or

20    injuring the right of the other party to receive the fruits of the contract. If a party to the contract

21    evades the spirit of the contract . . . he or she may be liable for breach of the implied covenant of good

22    faith and fair dealing") (internal quotation and citation omitted); Parker v. Columbia Bank, 604 A.2d

23    521, 531 (Md. Ct. App. 1992) (the duty of good faith and fair dealing "simply prohibits one party to a

24    contract from acting in such a manner as to prevent the other party from performing his obligations

25

1  under the contract," but does not obligate a party to take affirmative actions that the party is clearly

2  not required to take under the terms of the contract) (citation omitted).

3      Plaintiffs argue that the reasonable expectations of the parties to these partnership agreements

4  was that a majority partner would not be able to dissolve the partnership at any time by selling the

5  assets to itself.  As support, Plaintiffs cite a "Term" provision in each of these partnership agreements

6  providing that the partnership would continue for 99 years.  Defendants counter that the Term

7  provision actually states that the partnership would continue for 99 years or "until earlier terminated as

8  provided herein."  Defendants further argue that Plaintiffs' argument fails because the agreements

9  expressly provide that the majority partners could dissolve the partnerships without limiting the time

10  when this could occur.  Plaintiffs do not offer a reply.  Defendants' argument is persuasive on this

11  point.  Following Cincinnati, this Court cannot read Plaintiffs' interpretation of the Term provision

12  into the agreement.

13      Plaintiffs also argue that the reasonable expectation of the parties was that any sale of

14  partnership assets would be to an un-affiliated third party and would not be done for the sole purpose

15  of eliminating minority partners' interests.  By arranging the Asset Sale in the way Defendants did,

16  Plaintiffs maintain that Defendants' conduct was "oppressive" and "underhanded" and denied Plaintiffs

17  the fruits of the agreements.

18      Defendants counter that there is no evidence that the Asset Sales were unreasonable or

19  arbitrary or that Plaintiffs were denied the fruits of the bargain because they were paid their pro rata

20  share based on a fair market valuation.  Defendants argue that the duty of good faith and fair dealing

21  cannot be used to impose a limitation on to whom partnership assets could be sold when such a

22  limitation is nowhere in the partnership agreements.

23      Both parties rely on Oregon RAS No. 6 v. Castle Rock Cellular of Oregon, et al., 840 F. Supp.

24  770 (D. Or. 1993), aff'd Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon, 76 F.3d 1003,

25  1007 (9th Cir. 1996), and U.S. Cellular Inv. Co. of Los Angeles, Inc. v. GTE Mobilenet, Inc., 281

1   F.3d 929 (9th Cir. 2002).  In <u>Oregon RAS</u>, a partnership agreement for a cellular service partnership

2   provided that any sale or transfer of partnership interest to a non-affiliate triggered a right of first

3   refusal for all the other partners.  Parent corporation Cellular Inc. owned a partnership (CRCO) that

4   held in interest in the cellular service partnership.  Cellular Inc. attempted to convey its ownership of

5   CRCO to PTCI, which was a parent corporation whose subsidiary (PTCO) also held an interest in the

6   cellular service partnership.  Plaintiff, a different partner in the cellular service partnership, alleged that

7   the conveyance triggered its right of first refusal to acquire CRCO's interest.  Defendants had argued

8   that PTCI was not buying the CRCO's partnership interest, but was buying CRCO itself.  In other

9   words, that CRCO would still hold a partnership interest but would be controlled by fellow partner

10  PTCI and therefore the transfer right of first refusal was not triggered.  The court rejected defendants'

11  argument.  It determined that the parties' intent was to bar transferring a partnership interest to non-

12  affiliated entities without the consent of all the partners.  The court concluded that the conveyance was

13  "a blatant subterfuge intended to circumvent the right of first refusal clause."  840 F. Supp. at 775.

14  The court found that the conveyance was of CRCO's partnership interest, not of CRCO itself because

15  CRCO was merely a shell entity holding the partnership interest.  It did not conduct any other

16  business.  The court held that, although this conveyance may not have violated the express terms of

17  the partnership agreement, it breached the duty of good faith and fair dealing because the conveyance

18  was intended to "thwart plaintiff's legitimate contractual expectation that it would have a right of first

19  refusal" in this instance.  <u>Id.</u> at 776.

20      In <u>U.S. Cellular</u>, a partnership agreement providing cellular telephone services explicitly limited

21  a general partner's right to transfer or assign its interests by requiring unanimous consent of all other

22  partners, and it granted each limited partner a right of first refusal before any other partner transferred

23  its limited partnership interest.  <u>Id.</u> at 932.  AirTouch Cellular owned a majority of the partnership

24  interest.  Vodafone was the grandparent corporation of AirTouch.  Vodafone entered into a joint

25  venture (called Cellco) with an outside corporation and Vodafone sold all of the stock in its subsidiary

ORDER - 18

AirTouch to Cellco rather than transferring AirTouch's partnership interest to Cellco. As a result, AirTouch was still a partner but was owned by Cello rather than Vodafone. Plaintiff (a minority partner) alleged that the stock transfer was a "transfer" that triggered the agreement's anti-transfer provisions. The Ninth Circuit rejected plaintiff's argument because nothing in the limitations restricted the sale of stock of an owner of the partnership. 281 F.3d at 935. The court distinguished <u>Oregon RAS</u> because the transfer in that case was done purely to avoid the right of first refusal clause, whereas in <u>U.S. Cellular</u> AirTouch had existed and continued to exist after the sale of its stock as a genuine corporation conducting business. The court noted that its holding might be different had the stock sale been to a shell entity merely for the purpose of avoiding the transfer restrictions. <u>Id.</u> at 937.

Both <u>Oregon RSA</u> and <u>U.S. Cellular</u> are distinguishable. Unlike <u>Oregon RSA</u>, Plaintiffs have not presented any evidence to support their contention that they had a reasonable contractual expectation that partnership assets could be sold only to a non-affiliated outside party. Plaintiffs' assertions otherwise are based on pure speculation. Even if this Court were to conclude that AWS created shell entities to purchase the partnership assets, there is no evidence that Plaintiffs had a contractual expectation that this could not occur. Defendants are correct that there is no limiting clause in the partnership agreements that Defendants were trying to avoid by structuring the Asset Sales in the way that they did. In fact, the partnership agreements all contemplate asset sales, but in no way limit to whom the assets could be sold. To impose this obligation through the duty of good faith and fair dealing would extend the partnership agreement beyond its reasonable bounds. Therefore, summary judgment in favor of Defendants on this claim is warranted.

### C. Breach of Fiduciary Duty -- Breach of Duty of Loyalty and Care

Under their breach of fiduciary duty claim, Plaintiffs allege breach of the duty of loyalty and care. This claim is based primarily on Plaintiffs' contention that Defendants engaged in self-dealing transactions without the unanimous consent of the partners.

1    As discussed above, this Court will apply Washington law to Plaintiffs' breach of fiduciary

2    duty claim.  Under Washington law, a partner owes the partnership and other partners a duty of

3    loyalty and a duty of care.  RCW 25.05.165(1).  The duty of loyalty is limited in scope; it requires

4    partners "to account to the partnership and hold as trustee for it any property, profit, or benefit

5    derived by the partner in the conduct and winding up of the partnership business or derived from a use

6    by the partner of partnership property."  RCW 25.05.165(2)(a).  However, a partner may engage in

7    conduct that would violate the duty of loyalty if the partner discloses all the material facts and all of

8    the partners or a number or percentage specified in the partnership agreement authorize the conduct.

9    RCW 25.05.165(2)(c)(ii).  The duty of care requires that a partner refrain from "engaging in grossly

10   negligent or reckless conduct, intentional misconduct, or a knowing violation of law."  RCW

11   25.05.165(3).  A partner does not violate the duty of loyalty or care merely because the partner's

12   conduct furthers his own interest.  RCW 25.05.165(5).

13   The parties agree that Defendants owed a duty of loyalty and care to the partnerships and to

14   Plaintiffs.  They also agree that the Asset Sales were self-dealing transactions in that they furthered

15   Defendants' interests.  They disagree however as to whether the Asset Sales were self-dealing

16   transactions that violated the duty of loyalty or care.

17   Plaintiffs seem to contend that self-dealing transactions automatically constitute a breach of the

18   duty of loyalty unless the self-dealing partner obtained the consent of all the other partners.  They cite

19   no authority for this principle.  Nor could they.  Washington law makes clear that the mere fact that

20   the Asset Sales furthered Defendants' interests does not alone constitute a breach of the duty of

21   loyalty or care.

22   A partner engaging in a self-dealing transaction must do so consistently with the partner's

23   underlying fiduciary duty, which is to act fairly toward the partnership and other partners.  Under

24   Washington law, fairness requires that partners selling their partnership interest must make full and

25   complete disclosure of all material facts within their knowledge relating to partnership affairs, and they

ORDER - 20

1    must sell their interest for fair consideration.  <u>Karle v. Seder</u>, 35 Wn.2d 542, 550, 214 P.2d 684

2    (1950).  Therefore, the relevant questions in determining whether Defendants' self-dealing transactions

3    violated the duty of loyalty and care are 1) whether Defendants make a full and fair disclosure to the

4    other partners of all material facts that would have a bearing on the Asset Sales, and 2) whether the

5    price paid, based on the Arthur Anderson/Kroll appraisals, was fair.

6       At the outset, the Court notes that Plaintiffs' argument regarding Defendants' alleged breach

7    of fiduciary duty is difficult to follow; their response is incomprehensible at points and their citation to

8    the record lacks clarity and precision.

9       Defendants present evidence that when they made a final offer to Plaintiffs, they sent to

10   Plaintiffs an offer letter indicating that they would vote their majority interest to sell the partnership

11   assets if Plaintiffs did not accept the offer.  This letter was accompanied by a letter from Arthur

12   Anderson/Kroll indicating the appraised value of the partnerships and summarizing the valuation

13   report, as well as recent financial statements for the partnership.  Plaintiffs do not dispute this fact.

14   Defendants indicated that the partnerships incurred significant costs in preparing the financial

15   statements and holding annual meetings that were solely for the benefit of the minority partners, and

16   that by selling the partnership assets in the way they did, they would be released from having to incur

17   these costs.  Plaintiffs allege that AWS or its subsidiaries did not disclose the potential cost and tax

18   savings that Defendants expected as a result of the buy-out plan.  However, there is no basis to impose

19   on Defendants an obligation to report their cost and tax savings beyond what they already disclosed.

20   In sum, Plaintiffs have not shown that such information was material.

21       The parties dispute whether the price paid, based on the Arthur Anderson/Kroll appraisals, was

22   fair.  Defendants' valuation expert, Carlyn Taylor, reviewed the Arthur Anderson/Kroll valuations and

23   concludes that they were done in accordance with the applicable professional standards and that the

24   values are reasonable, especially in light of the market decline after the appraisals were performed.

25   (Taylor Decl., ¶¶ 1, 3).  Plaintiffs counter by pointing to their valuation expert Charles Walters'

1   critique of Ms. Taylor's analysis, as set for in Walters' January 12th letter.  Mr. Walters claims that

2   Ms. Taylor's report contains errors and that her conclusion regarding reasonableness was unsupported

3   by her own analysis.  Importantly, however, there is no coherent opinion of what the fair value of the

4   partnerships as the Asset Sales dates should have been.  As such, Plaintiffs have presented no coherent

5   evidence that the values should have been materially different.

6        Plaintiffs also argue that Defendants improperly allocated revenues and expenses to the

7   partnerships, which presumably Plaintiffs would argue affects the appraisals.  (Again, Plaintiffs'

8   argument and citation to the record is difficult to follow and at points incomprehensible.)  Defendants

9   counter that Plaintiffs have failed to identify with any specificity which allocation methods are

10   unreasonable under professional accounting standards.[7]  Plaintiffs rely on a March 11, 2005 expert

11   report by Evin Morris.  This Court has stricken that report because it was not filed timely.  (Dkt. Nos.

12   256 & 297).  Therefore, Plaintiffs cannot rely on Morris' March 11 report to establish a genuine issue

13   of material fact as to the appraised value of the partnerships.

14        Lastly, the price that Cingular paid to acquire AWS and its subsidiaries has no bearing on

15   whether the Arthur Anderson/Kroll appraisals were reasonable because Cingular's acquisition

16   occurred between one and two years after the Asset Sales.  Future events are immaterial to

17   determining the reasonableness of the appraisals at the time they were done.

18   IV.  Claims Relating to Both the Switch-sharing Service Fees and the Asset Sales

19       A.  Tortious Interference

20        Plaintiffs claim that AWS tortuously interfered by causing AWS subsidiaries to breach the

21   partnership agreements.  To succeed on a tortious interference claim, the plaintiff must satisfy five

22   elements: "(1) the existence of a valid contractual relationship or business expectancy; (2) that

23

24      [7]  They also counter that any claims based on allocations earlier than three years ago are barred
under the statute of limitations.  See Hudson v. Condon, 101 Wn. App. 866, 873, 6 P.3d 615 (2000)

25   (breach of fiduciary duty claim is subject to a three-year statute of limitations).

1  defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a

2  breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper

3  purpose or used improper means; and (5) resultant damage." Leingang v. Pierce County Medical

4  Bureau, Inc., 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

5       In light of the Court's holding on Plaintiffs' breach of partnership agreement claims, Plaintiffs'

6  tortious interference claim necessarily fails.

7       B.  Negligent and/or Intentional Misrepresentation

8       Plaintiff S&D Partnership ("S&D") claims that Defendants intentionally or negligently

9  misrepresented their power to force Plaintiff S&D to sell its interest in the Yakima partnership, and

10 they failed to disclose financial information relevant to the decision to sell.  Specifically, S&D contends

11 that it was damaged by being exposed to Defendants' affirmative defense that S&D waived its right to

12 sue by accepting the offer.  This argument is nonsensical and without merit.  Summary judgment is

13 warranted on this claim.

14      C.  Unjust Enrichment

15      Plaintiffs' unjust enrichment claim fails because Washington law prohibits parties to a written

16 contract from suing on a theory of unjust enrichment.  See MacDonald v. Hayner, 43 Wn. App. 81,

17 86, 715 P.2d 519 (1986) ("The courts will not allow a claim for unjust enrichment in contravention of

18 a provision in a valid express contract.") (citation omitted).

19                                          CONCLUSION

20      The Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiffs'

21 Motion for Partial Summary Judgment.  Summary judgment is warranted on Plaintiffs' breach of

22 partnership agreement and breach of fiduciary duty claims regarding the switch-sharing service fees

23 because Plaintiffs have failed to present any evidence showing that they suffered damages as a result of

24 Defendants' alleged breaches.  Summary judgment is warranted on Plaintiffs' breach of partnership

25 agreement claim regarding the sale of partnership assets because Plaintiffs have not shown that these

1    were illegitimate sales in violation of the partnership agreement provision on asset sales.  Likewise,

2    Plaintiffs have not shown that the sales were acts outside the ordinary course of business requiring the

3    consent of all the partners.  Summary judgment is warranted on Plaintiffs' breach of the duty of good

4    faith and fair dealing claim.  Plaintiffs have not presented any evidence indicating that the partners in

5    these partnership agreements intended to limit to whom the partnership assets could be sold.

6    Summary judgment is warranted on Plaintiffs' breach of fiduciary duty claim because Plaintiffs have

7    not shown that there are genuine issues of material fact about the adequacies of Defendants'

8    disclosures prior to the Asset Sales or the adequacies of the appraised value of the partnerships.

9    Summary judgment is warranted on Plaintiffs' tortious interference claim because Plaintiffs' breach of

10   partnership agreement claims fail.  Summary judgment is warranted on Plaintiffs' negligent and/or

11   intentional misrepresentation claim because Plaintiff S&D Partnership has not presented any evidence

12   that Defendants intentionally or negligently misrepresented facts.  Summary judgment is warranted on

13   Plaintiffs' unjust enrichment claim because this cause of action does not apply to written contracts.  In

14   light of the Court's holdings, Defendants' various arguments regarding Plaintiffs' preferred

15   remedies are moot.

16          The clerk is directed to provide copies of this order to all counsel of record.

17          Dated: May 10, 2005

18
                                    /s/ Marsha J. Pechman
19                                  Marsha J. Pechman
                                    United States District Judge
20

21

22

23

24

25

ORDER - 24